1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BARBARA J. PITT, | Case No. 1:13-CV-01596-SMS |
| Plaintiff, | |
| v. | ORDER AFFIRMING AGENCY'S DENIAL OF BENEFITS AND ORDERING JUDGMENT FOR COMMISSIONER |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

Plaintiff Barbara J. Pitt by her attorneys, Law Offices of Lawrence D. Rohlfing, seeks

judicial review of a final decision of the Commissioner of Social Security ("Commissioner")

denying her application for disability insurance benefits pursuant to Title II and for supplemental

security income ("SSI") pursuant to Title XVI of the Social Security Act (42 U.S.C. § 301 *et seq.*)

(the "Act"). The matter is before the Court on the parties' cross-briefs, which were submitted

without oral argument to the undersigned United States Magistrate Judge. Following a review of the

complete record and applicable law, the Court finds the decision of the Administrative Law Judge

("ALJ") to be supported by substantial evidence.

1

**BACKGROUND**

## I. Procedural History

On May 11, 2010, Plaintiff applied for disability insurance and SSI benefits.  In the application, Plaintiff alleged disability beginning December 1, 2009.  The Commissioner initially denied the claims on September 16, 2010, and upon reconsideration again denied the claims on March 10, 2011.  On March 24, 2011, Plaintiff filed a timely request for a hearing.

On March 29, 2011, Plaintiff appeared and testified in front of Robert E. Lowenstein, Administrative Law Judge ("the ALJ").  *See* 20 C.F.R. 404.929 *et seq.*  An impartial vocational expert, Susan T. Moranda, appeared and testified telephonically.

On April 13, 2012, the ALJ denied Plaintiff's application.  The Appeals Council denied review on August 7, 2013, thus the ALJ's decision became the Commissioner's final decision.  *See* 42 U.S.C. § 405(h).  On October 2, 2012, Plaintiff filed a complaint seeking this Court's review pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3).

## II. Administrative Record

A.  *Plaintiff's Testimony* (November 16, 2011)

Plaintiff, born March 3, 1955, lived alone in her one-story house at the time of the hearing.  Plaintiff is able to communicate in English and completed high school.  Plaintiff testified that she last worked in 2008 as a bookkeeper.  Plaintiff testified that she was not currently working and had not worked since being terminated from her job in 2008.

Plaintiff testified that the primary problem currently keeping her from working was her "high anxiety and nervousness," that she "cannot concentrate . . . for a long period of time," and that she "can't really sit too long," because she starts getting cramps in her legs.  She reported that she can focus for "maybe an hour, maybe 15 minutes.  It all depends . . . ."  Plaintiff stated that she had sought work, but due to her concentration problems she could not return to her previous work as a bookkeeper.  She also testified that she had pain "all the time" in her lower back, the center of her

2

back and her left shoulder.  Plaintiff testified that her treating doctor, Dr. Sorensen, told her it was a pinched nerve and that nerve damage caused the numbness in her left hand.  The ALJ asked the Plaintiff if anything else kept her from working, and Plaintiff responded "I don't have any money to get gas."  When the ALJ told her that lack of funds would not impact the disability finding, the Plaintiff responded, "I – I'm not comfortable driving because I'm dizzy and I'm on a lot of medication."  Plaintiff stated that she drove herself 45 minutes to the hearing.  Plaintiff testified that she maintained her driver's license and drove occasionally.

Plaintiff testified that she managed her self-care.  Plaintiff reported that she was able to handle finances, and shop for food and clothes.  Plaintiff stated that she was capable of household chores such as cooking meals, shopping, doing dishes, laundry, making her bed, vacuuming, cleaning the bathroom and kitchen, and raking leaves, though her neighbor helped to take out her garbage cans and a friend mowed her lawn.  Plaintiff described her typical daily activities as follows: getting up and making a meal for herself, getting dressed and "get[ing] myself going," reading, "try[ing] to do something to keep my mind going," making a lunchtime meal, walking "a little bit . . . maybe a couple houses down," resting in the afternoon, eating dinner, resting again, then having phone calls with friends and family in the evening before bed.  She said that she socialized with people on the telephone multiple times per week.  Plaintiff stated that she had a big family and "they try to help," for example, by paying her phone bill, bringing her groceries and "other things."  She reported that she did not receive any government assistance or food stamps.

Plaintiff alleged onset of disability in December 2009, post-dating her termination from her previous job as a bookkeeper, and reported that she has had concentration and back problems since before 2008.  She testified that on a scale of one to ten, her static back pain is "close to an eight, nine . . . sometimes ten."  The pain was made worse by bending down, and sometimes causes her such pain that she "can hardly breathe anymore," and cannot sleep.  To manage her pain, Plaintiff reported taking over-the-counter medications such as aspirin, as well as having prescriptions from

Dr. Sorensen for other issues, including calcium carbonate for osteoporosis prevention, lorazepam for psoriasis and anxiety, levothyroxine for thyroid, vitamin D for bone health, and prednisone for psoriasis.  She stated that she also treated her condition by resting.

Plaintiff estimated that she could walk approximately 15 minutes before needing to rest, stand for 15-20 minutes before she had to sit, stand for two to three hours cumulatively in an eight-hour workday, sit for two hours at a time, sit for three to four hours cumulatively in an eight-hour workday, and could lift approximately ten pounds occasionally, but less than ten pounds frequently. Plaintiff testified she was approximately five feet one inches tall and weighed 100 pounds.

Plaintiff complained of mental impairments.  Other than her regular doctor, Plaintiff testified that she had not received any treatment for and was not seeing a specialist or mental health professional about her anxiety, concentration, or any other mental health issues.

*B.  Adult Function Report*

In an Adult Function Report dated June 3, 2010, Plaintiff complained of back pain and anxiety.  Plaintiff reported that her medical condition limited her ability to work because she "can't concentrate well."  Plaintiff reported that the job she performed the longest was "assistant bookkeeper" apparently at RFMC Construction in Fresno, her only employer between 1993-2008. She reported having been fired or laid from a job at RFMC Construction because she had problems getting along with other people.

Plaintiff wrote that she was able to prepare her own meals, she did housework such as laundry and light cleaning approximately "3 times per week," and she did not require assistance to do them.  She reported that she gets around well and tries to go outside every day.  She listed that she walked or drove a car, could go out alone, and shopped in stores for food and essentials for "a couple of hours," approximately once per week.  She wrote that she could count change and use a checkbook or money orders, but was unable to pay bills or handle a savings account only because she had no money or savings account.

When prompted to detail her daily activities, she explained:

I try to exercise and keep my muscles going.  My back hurts really bad every day.  I can't sleep at night, so I am exhausted every day.  I eat what I can.  I try to read to keep my mind going.  I have very high anxiety.  Feel depressed.  I am going through menopause, night sweats, tired, fatigue.  I pray a lot.  I watch some tv before I try to sleep.  I take a shower and I always feel dizzy and light headed. Nervous.

She listed her hobbies and interests as reading daily for one hour and watching television "2 [two] hours in the evening."  She reported that she regularly spent time with others on the phone "every day that I feel good enough."  She did not need to be reminded to go places, she "sometimes" needed someone to accompany her, but did not have any problems getting along with family, friends, neighbors, or others.  She explained that she did not socialize "hardly at all" because she "can't do much with back pain all the time."

Plaintiff complained that when she stood for too long she got "dizzy," "short of breath," and when she went out she was "afraid to fall."  Plaintiff wrote that she: did not sleep well, was easily tired, could only concentrate for short periods, could walk about 50 feet before resting for two hours, only "sometimes" finished what she started, followed written instructions "not well," and spoken instructions "sometimes good, sometimes not well."  Plaintiff reported getting along with authority figures "good." She reported that she did not handle stress or changes in routine well.   She reported that she had an unusual level of stress and anxiety, was "always stressed," "always" had unusual behavior or fears, and had days when she felt "too bad" to go outside.   When asked to describe the details of her unusual behavior or fears, she wrote only, "I am always."  She estimated that she could lift 20 pounds, but that her condition limited her lifting, squatting, bending, standing, reaching, walking, kneeling, stair-climbing, memory, completing tasks, and concentration.   She did not provide information about how she treated her condition.  Plaintiff left blank the "Remarks" section for added information.

//

//

5

### C.  Medical Evidence

The ALJ properly considered the following medical records and opinions.  The objective medical evidence confirmed the diagnosis of psoriasis, hypothyroidism, menopause, anxiety, fatigue, depression, and alcohol dependence.  The medical evidence confirmed that Plaintiff received treatment for some of these complaints from various physicians between 2009 and 2012.  During this time, there are periods during which the medical records show no treatment.  No psychiatric or mental health treatment notes exist in the record.

#### 1.  Treating Physician: Dr. Sorensen

In medical records from December 2008 through April 2012, Eric Sorensen, M.D., made notes on Plaintiff's monthly or near monthly visits.  During this period he reported that Plaintiff's primary complaint was a need for prescription refills.  Specifically, on January 5, 2010, Plaintiff saw Dr. Sorensen for a prescription refill request and complained of hot flashes but not pain, for which the doctor prescribed estrogen.  On February 16, 2010, Plaintiff saw Dr. Sorensen, complaining of a cough.  The cough persisted, and Plaintiff saw Dr. Sorensen again on March 2, 2010, when she first complained of pain on her right side.

The next day, March 3, 2010, Plaintiff sought treatment for her cough at Clovis Community Medical Center ("CCMC"), where she received medication for acute bronchitis.  CCMC records of Plaintiff's physical examination show a normal range of motion in the extremities.

On March 9, 2010, Plaintiff returned to Dr. Sorensen complaining of cough and side pain, and sought prescription refills.  In subsequent appointments, Plaintiff continued to complain of cough and mild pain (ranging from two to five on a 0-10 point scale).  At Dr. Sorensen's request, Advanced Medical Imaging performed a chest x-ray in May 2010, and a CT scan in June 2010, each with normal results.  The CT scan showed no acute findings in the lungs, no evidence of pancreatitis, and a likely cyst though it was "too small to characterize."

In a medical source statement dated October 26, 2010, Dr. Sorensen estimated that Plaintiff's lifting/carrying was affected by her impairment. He listed the following restrictions: Plaintiff's maximum occasional or frequent lift/carry capacity was approximately 10 pounds; she could stand and/or walk with normal breaks for about 6 hours in an eight-hour workday; she could sit with normal breaks for about 6 hours in an eight-hour workday; she could occasionally climb, balance, stoop, kneel, crouch, crawl, reach, handle, or finger, for up to one-third of the day. He listed no environmental restrictions. Dr. Sorensen noted that the onset date for his recommended restrictions for Plaintiff became effective when she stopped work, which he listed as September 20, 2006. As the basis for his conclusions, he wrote only, "History." Asked for supportive evidence, Dr. Sorensen wrote that his recommended restrictions were based on Plaintiff's "perceived pain." Prompted for an outline of the bases of his conclusions regarding limitations, Dr. Sorensen wrote, "Hx [history] of thyroid disease; multiple joint pain; severe generalized anxiety; Psoriasis steroid depend [illegible] ≥ 20+ years; chronic pancreatitis; chronic pain syndrome." Dr. Sorensen wrote that he had been Plaintiff's primary care physician since 1980 and his qualifications included 30 years in practice.

Also dated October 26, 2010, Dr. Sorensen completed a psychiatric/psychological medical source statement. In it, he wrote that Plaintiff was "capable" of relating to and interacting with supervisors and co-workers. He noted that Plaintiff's ability to understand, remember and carry out an extensive variety of technical and/or complex job instructions was affected because Plaintiff "has chronic [illegible] [with] some associated memory loss." He opined that Plaintiff was "capable" of understanding, remembering and carrying out simple one- or two-step job instructions and dealing with the public "when not ill." Dr. Sorensen further stated that Plaintiff was "not capable" of maintaining concentration and attention for at least two hour increments because she "has severe chronic [health] problems and chronic pain." He found that she was "not capable" of withstanding the stress and pressures associated with an eight-hour workday and day-to-day work activities because she had "generalized anxiety and depressive disorder." Dr. Sorensen opined that Plaintiff

had a "poor prognosis," and the expected duration of Plaintiff's condition was "chronic."  He stated

that the onset of Plaintiff's problems "as described," was in 2006, and Plaintiff had only "fair

response to treatment."  Dr. Sorensen listed Plaintiff's experiential side effects from medications as

"somnolence; altered mental state; irritability."  He wrote that Plaintiff was capable of handling

funds.  He opined that Plaintiff did not require any additional testing or evaluation.

On a one-page psychiatric/psychological medical source statement dated February 28, 2012,

Dr. Sorensen left blank all but one of five questions.  That question asked whether the Plaintiff had

the ability to maintain concentration and attention for at least two hour increments, to which Dr.

Sorensen replied: "She is not capable of maintaining concentration due to her chronic gastro-

intestinal problems.  She has chronic pain associated with this."

In records from ten different examinations in the period December 2008 through April 2012,

Dr. Sorensen noted that Plaintiff's reported pain was a "0" on a 0-10 scale.  Dr. Sorensen did not

prescribe any pain medications during this period.  For the period December 2010 through April

2012, Dr. Sorensen continued to see Plaintiff regularly, approximately every other month, in order to

fulfill prescription refills and administer hormone shots.  Plaintiff reported zero pain at the majority

of visits during this period.  On August 9, 2011, Plaintiff reported elbow pain to a different health-

care provider.  On February 28, 2012, Plaintiff first complained of bilateral shoulder pain, and rated

it an "8" on a 0-10 pain scale.  Progress notes from this February 2012 visit are the only instance in

which Dr. Sorensen or his associates noted Plaintiff reported shoulder pain.  At her next visit with

Dr. Sorensen on April 17, 2012, she reported no pain.  At a visit with Dr. Sorensen on January 24,

2014, Plaintiff reported abdominal pain which in his treatment notes, the doctor described as "food

poisoning."

2.  Examining Physician: Dr. Ekram Michiel

On August 20, 2010, the consultative doctor and board certified psychiatrist, Ekram Michiel,

M.D., performed a thorough psychiatric examination and reviewed the available medical evidence,

including treatment records and diagnostic reports.  Dr. Michiel took a detailed history from Plaintiff during the consultative examination in which Plaintiff reported that she had depression and anxiety, memory problems, diarrhea and bladder problems, and a heart murmur.  She told the doctor that she drank "a lot," and had been diagnosed with liver disease and pancreatitis due to her drinking. Plaintiff reported to Dr. Michiel that she experienced panic attacks and felt anxious and panicky all the time.  Dr. Michiel observed that the Plaintiff was fairly well groomed, casually dressed with adequate personal hygiene, her gait and posture were normal, with no involuntary movements or specific mannerisms.  He observed that she maintained good eye contact throughout the evaluation and that her speech and general body movements were normal.

The results of Plaintiff's mental status examination were unremarkable.  Plaintiff was oriented to person, place, and date.  She registered and recalled three out of three objects in five minutes, appropriately answered a verbal math question, correctly recited a series of digits back- wards, and did four steps of serial threes correctly.  Dr. Michiel assessed Plaintiff as capable of abstract thinking, with appropriate insight and judgment, though her mood was "depressed," and her affect was "restricted/sad."  He noted that Plaintiff denied suicidal or homicidal ideations.  Dr. Michiel listed Plaintiff's then-current medications as follows: clonidine, acyclovir, levothyroxine, lorazepam, prednisone, omeprazole, campral, ciprofloxacin, and calcium.  Dr. Michiel highlighted that Plaintiff had no psychiatric treatment or hospitalizations, and she was not receiving any mental health treatment or follow-up.

Dr. Michiel administered psychological testing, the results of which were within a moderate normal range.  The results of Plaintiff's Global Assessment of Functioning was 55.[1]  Dr. Michiel diagnosed Plaintiff with alcohol dependence and anxiety disorders not otherwise specified, as well as hepatitis, pancreatitis, hypothyroidism, and noted her stressors included her health condition.  Dr.

---

[1] A GAF score of 51-60 is indicative of moderate symptoms such as a flat affect or occasional panic attacks, or moderate difficulty in social, occupational or school functioning such as having few friends or having conflicts with coworkers. Am. Psychiatric Assoc., *Diagnostic & Statistical Manual of Mental Impairments, 4th ed., text revised* (2000).

Michiel opined that based upon his evaluation and observation throughout the interview, Plaintiff was able to maintain attention and concentration and to carry out simple job instructions, was able to relate and interact with coworkers, supervisors, and the general public, but was unable to carry out an extensive variety of technical and/or complex instructions.  He also opined that Plaintiff was unable to manage her finances due to her alcohol dependence.

### 3.   Consultative Doctors

On August 3, 2010, the State agency medical consultant, C. De la Rosa, M.D., catalogued significant objective findings, as follows: in October 2004, Plaintiff had previously made similar allegations and had been denied benefits; similar to her instant allegations, at that time, her complaints were nerves, skin disorder, anxiety, heart murmur, depression, and concentration problems.  In February 2009, Plaintiff was diagnosed with alcohol abuse and psoriasis.  The report noted an "unremarkable" physical exam at an emergency room visit in March 2010, and a diagnosis of "back strain" in June 2010.  Dr. De la Rosa also reviewed medical records from Drs. Sorensen and Michiel, as described *supra*.

Dr. De le Rosa opined that Plaintiff's credibility was "challenged" in that reported symptoms were only partially supported by diagnosis, and the alleged degree of functional limitations was not supported by the objective medical evidence.  Specifically, Dr. De le Rosa noted Plaintiff's inconsistency where she presented several complaints which, per the objective medical findings, were not expected to cause significant limitations lasting at least 12 months.  Dr. De le Rosa concluded that Plaintiff's instant complaints of nerves, skin disorder, anxiety, insomnia, heart murmur, and depression were non-severe and did not meet the criteria for disability.

In a psychiatric review dated September 7, 2010, the state agency psychiatrist, Helen C. Patterson, Ph.D., reviewed Plaintiff's case materials including medical records described *supra*.  The assessment covered the period December 1, 2009 to September 2010.  Dr. Patterson opined that Plaintiff's anxiety and substance addiction disorders were nonsevere, and that her impairments alone

1    or in combination did not meet the standard for disability.  Dr. Patterson noted that a medically

2    determinable impairment was present and described the diagnosis as "Anxiety D/O," and further

3    explained that Plaintiff's behavioral changes or physical changes were associated with the regular

4    use of substances that affect the central nervous system.  She listed a diagnosis of "alcohol

5    dependency."

6          Dr. Patterson indicated that Plaintiff had functional limitations as follows: mild restriction of

7    activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in

8    maintaining concentration, persistence, or pace; no episodes of decompensation; and no evidence of

9    the presence of "C" criteria (e.g. schizophrenia or repeated episodes of decompensation).  Dr.

10   Patterson highlighted an inconsistency in Plaintiff's reporting because Plaintiff listed an anti-

11   anxiolytic among her prescribed medications, however, Dr. Patterson could find no reference to such

12   a prescription in the medical records.  Dr. Patterson further noted that there was "no evidence of the

13   claimant having any history of formal treatment for a psychiatric disorder."  In her conclusion, Dr.

14   Patterson summarized that "[w]ith no treatment history, only mild observed signs of mood

15   disturbance on formal exam, the preponderance of the evidence fails to support the presence of a

16   severe mental impairment."

17          On February 8, 2011, consultative physician, L. Bobba, M.D., reviewed the objective

18   medical evidence in the record at the request of the state agency.  Dr. Bobba also opined that

19   Plaintiff's credibility was challenged because "there is little current objective evidence to support"

20   her alleged limitations.  Dr. Bobba highlighted an inconsistency in Plaintiff's allegations, in that

21   Plaintiff alleged a worsening condition, yet there appeared to be no documented change in her

22   functional limitations.  Dr. Bobba recommended adopting the initial finding that Plaintiff's physical

23   impairment was nonsevere and did not meet the criteria for disability.

24          On March 8, 2011, state agency psychologist Randall J. Garland, Ph.D., performed a

25   Psychiatric Review Technique (recording his conclusions on a form known as a "PRTF") and a

11

Mental Residual Functional Capacity Assessment.  In the Mental RFC assessment, Dr. Garland found that Plaintiff was "moderately limited" in her ability to maintain attention and concentration for extended periods; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and ability to respond appropriately to changes in a work setting. Dr. Garland concluded that Plaintiff was "not significantly limited" in the following areas: ability to understand and remember detailed instructions; ability to carry out detailed instructions; ability to perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerances; ability to interact appropriately with the general public; ability to accept instructions and respond appropriately to criticism from supervisors; ability to be aware of normal hazards and take appropriate precautions; ability to travel in unfamiliar places or use public transportation.  Dr. Garland found "no evidence of limitations" in Plaintiff's ability to remember locations and work-like procedures; ability to understand and remember very short and simple instructions; ability to carry out very short and simple instructions; ability to sustain an ordinary routine without special supervision; ability to work in coordination with or proximity to others without being distracted by them; and her ability to make simple work-related decisions.

In his PRTF, Dr. Garland noted that the categories upon which the medical disposition was based were "12.06 Anxiety-Related Disorders," and "12.09 Substance Addiction Disorders."  He opined that an RFC assessment was necessary.  Dr. Garland did not find documentation that evidenced any organic mental or affective disorders.  He noted that a medically determinable impairment was present that did not satisfy the diagnostic criteria under 12.06 Anxiety-Related Disorders, and listed Plaintiff's disorder as "GAD; Anxiety Disorder NOS."  In addition, Dr. Garland found that Plaintiff had behavioral or physical changes associated with the regular use of substances that affect the central nervous system, specifically, "12.04 Affective disorders," and "12.06 Anxiety-related disorders."  Dr. Garland opined that Plaintiff had the following functional

12

limitations: moderate difficulty in maintaining concentration, persistence, or pace; mild restriction of activities of daily living; mild difficulty in maintaining social functioning; and found no episodes of decompensation.  He noted that evidence did not establish the presence of any "C" criterion.   After review of Plaintiff's case materials including additional medical records since the prior assessment, Dr. Garland opined that Plaintiff's records did not suggest a change in Plaintiff's functional limitations.  He opined that "the whole of the evidence suggests that the [claimant] has more than nonsevere limitations in sustained concentration [and] persistence but is not precluded from unskilled work."

   D.  Vocational Expert Testimony (November 16, 2011)

        Susan Moranda testified telephonically as vocational expert before the ALJ at the November 2011 hearing.  She classified Plaintiff's past relevant work as an assistant bookkeeper as skilled work, Specific Vocational Preparation ("SVP") level 6, sedentary exertional level.  In the first hypothetical, the ALJ described a hypothetical person who would be able to maintain attention and concentration, could carry out simple job instructions, could relate and interact with coworkers, supervisors, and the general public, but who was unable to carry out an extensive variety of technical and/or complex instructions.  Considering the demands of the "very complex" bookkeeping work and the limitations of such an RFC, the VE testified that a similarly capable individual would not be able to perform the demands of Plaintiff's previous position as it is actually and generally performed. She further testified that Plaintiff had no transferable skills.

        Alternatively, the VE opined that additional jobs existed in the national economy which a similarly capable individual *could* perform.  The VE testified that a similarly capable individual could perform the full range of medium, unskilled[2] job with an SVP of 2, such as "dishwasher"

---

[2] "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength. For example, we consider jobs unskilled if the primary work duties are handling, feeding, and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or

(DOT code 318.687-010), with 40,000 jobs in California, "handpackager" (DOT code 920.587-018), with approximately 200,000 jobs in California, or "landscape assistant" (DOT code 406.687-010), with 20,000 jobs in California.  The VE testified that the national job numbers were approximately nine times the respective California job numbers.

The ALJ posed a second hypothetical where an individual could lift and carry ten pounds occasionally or frequently, could sit six hours out of an eight-hour workday with normal breaks every two hours and a lunch period providing sufficient relief, could occasionally climb, balance, stoop, kneel, crouch, crawl, reach, handle, or finger with either hand, and had no environmental restrictions.  Considering the demands of the bookkeeper position (including requirements for frequent reaching, handling, fingering during continuous clerical work), and these functional limitations, the VE testified that a similarly capable individual would not be able to perform the demands of Plaintiff's previous position as it is actually and generally performed.

In a third scenario, the ALJ presented a hypothetical individual with the following limitations: moderately limited in the ability in the ability to maintain attention and concentration for extended periods; moderately limited in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; and the ability to respond appropriately to changes in the work setting.  With such limitations, the VE testified that a similarly capable individual would not be able to perform the Plaintiff's previous position.  Because the individual would be "profoundly limited even for [a] simple routine at an unskilled level," the VE testified that such an individual would not be able to perform any work available in the national economy.

In a fourth scenario, the ALJ described a hypothetical person with no physical restrictions, who could meet basic mental demands of unskilled work on a sustained basis; could understand,

machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed. A person does not gain work skills by doing unskilled work." *See* Social Security Ruling 83-10.

carry out, remember simple instructions; could make judgment commensurate with the functions of unskilled work, such as simple decisions; could respond appropriately to supervision, coworkers, and work situations; and could deal with changes in a routine work setting.  The VE stated that a similarly capable individual would not be able to perform the demands of Plaintiff's previous position as it is actually and generally performed because it necessitated complex instructions. Although, the VE testified that a similarly capable individual *would* be able to perform other work available in the national economy, such as the three jobs listed in his response to the first hypothetical.

Plaintiff's counsel posed a scenario where the hypothetical individual was unable to maintain concentration and attention for two hour increments and was incapable of withstanding the stress associated with an eight-hour workday and day-to-day work activities.  The VE testified that a similarly capable individual would not be able to perform Plaintiff's previous work, or any work.

**LEGAL STANDARD**

An individual is considered disabled for purposes of disability benefits if he or she is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a) (3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003). The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability. 20 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f). In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting her from performing basic work activities. *Id.* §§ 404.1520(c), 416.920(c). If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments, 20 C.F.R. 404, Subpart P, App. 1. *Id.* §§ 404.1520(d), 416.920(d). If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient RFC, despite the impairment or various limitations to perform his past work. *Id*. §§ 404.1520(f), 416.920(f). If not, in Step Five, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy. *Id*. §§ 404.1520(g), 416.920(g). If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps. *Tackett v. Apfel*, 180 F.3d 1094, 1098–99 (9th Cir. 1999); 20 C.F.R. §§ 404 .1520, 416.920.

## DISCUSSION

Plaintiff argues that the ALJ erred in his assessment of Plaintiff's credibility and in rejecting the testimony of Plaintiff's treating physician, Dr. Sorensen. The Commissioner replies that the ALJ did not err in in rejecting Plaintiff's subjective reports and discounting Dr. Sorensen's internally inconsistent opinion which was based primarily on Plaintiff's self-serving complaints, in favor of the opinions of Drs. Michiel, De le Rosa, Garland, Bobba, and Patterson, which were consistent with the objective evidence of record and Plaintiff's conservative treatment.

## I.    The ALJ's Determination

Based on the weight of the physicians' opinions, the ALJ concluded that the Plaintiff's subjective complaints were greater than the objective findings and not consistent with the objective medical evidence.

The ALJ found that Plaintiff met the insured status requirements of the Act through December 31, 2014.  Plaintiff had not engaged in substantial gainful activity since December 2009, her alleged onset date.  Plaintiff was 54 years old on the alleged disability onset date, an individual closely approaching advanced age, and subsequently changed age categories to advanced age. *See* 20 C.F.R. 404.1563 and 416.963.  Her severe impairments were anxiety, fatigue, depression, and alcohol dependence. *See* C.F.R. 404.1520(c), and 416.920(c).  None of these impairments alone or in any combination met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926.  The ALJ found that Plaintiff had the RFC to maintain attention and concentration to carry out simple job instructions and she was able to relate to and interact with coworkers, supervisors, and the public; but was unable to carry out an extensive variety of technical and/or complex instructions.  In doing so, he considered all symptoms and the extent to which those symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence.  The ALJ did not include any physical or environmental limitations.  The ALJ found that Plaintiff was not capable of performing any past relevant work.  The ALJ found that Plaintiff had the RFC to perform simple, repetitive tasks and the full range of unskilled, sedentary work.

Considering Plaintiff's age, education, work experience and RFC, the ALJ concluded that Plaintiff could perform the entire world of unskilled work at the medium, light, and sedentary exertional levels, and those jobs were available in significant numbers in the national economy.  *See* 20 C.F.R. 404.1569, 404.1569(a), 416.969, and 416.969(a).  Accordingly, Plaintiff was not disabled as defined by the Social Security Act.

## II.      Scope of Review

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision.  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *See, e.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  If the ALJ applied the proper legal standards and the ALJ's findings are supported by substantial evidence, this Court must uphold the ALJ's determination that the claimant is not disabled.  *See, e.g., Ukolov v. Barnhart*, 420 F.3d 1002, 104 (9th Cir. 2005); *see also* 42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1998 (9th Cir. 2008).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Burch*, 400 F.3d at 679.  Where the evidence as a whole can support either outcome, the Court may not substitute its judgment for the ALJ's, rather, the ALJ's conclusion must be upheld.  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## III.      Whether the ALJ Failed to Properly Weight the Medical Evidence

Plaintiff contends that the ALJ failed to give specific and legitimate reasons for rejecting the opinion of her treating physician, Dr. Sorensen, in favor of the examining physician, Dr. Michiel, and consultative doctors, Dr. Michiel, Dr. De le Rosa, Dr. Garland, Dr. Bobba, and Dr. Patterson. Plaintiff argues that the ALJ should have fully credited her treating physician.

### A.  Plaintiff's Credibility

Before considering medical opinion, the Court finds it relevant to consider Plaintiff's credibility, an important factor in evaluating her claims.  The ALJ found that although Plaintiff's reported symptoms were consistent with objective medical evidence, her reports of the intensity, persistence, and limiting effects of her symptoms were not fully credible.

An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional requirement. *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), *quoting Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester*, 81 F.3d at 834, *quoting Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988). He or she must set forth specific reasons for rejecting the claim, explaining why the testimony is unpersuasive. *Orn*, 495 F.3d at 635. *See also Robbins v. Social Security Admin.*, 466 F.3d 880, 885 (9th Cir. 2006). The credibility findings must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

When weighing a claimant's credibility, the ALJ may consider the claimant's reputation for truthfulness, inconsistencies in claimant's testimony or between his testimony and conduct, claimant's daily activities, claimant's work record, and testimony from physicians and third parties about the nature, severity and effect of claimant's claimed symptoms. *Light v. Social Security Administration*, 119 F.3d 789, 792 (9th Cir. 1997). The ALJ may consider "(1) ordinary techniques of credibility evaluation, such as claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008), *quoting Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996). If the ALJ's finding is supported by substantial evidence, the Court may not second-guess his or her decision. *Thomas*, 278 F.3d at 959.

In this case, the ALJ highlighted the insufficiency of the evidence supporting Plaintiff's allegations of total disability. The ALJ emphasized that, in contrast to her allegations of complete disability, the Plaintiff reported that she remained quite functional. Plaintiff self-reported, and the

medical records demonstrate, that she continued to live independently, perform self-care without assistance, perform light household chores, cook meals, shop in stores, go out, maintain her driver's license and drive alone.  Further, the ALJ emphasized that while Plaintiff made intermittent complaints of back pain, anxiety, and concentration issues, the medical records do not indicate any treatment for back issues or mental health issues.  Although Plaintiff complained of back pain – symptoms beyond menopause or hypothyroidism – there is no imaging evidence or abnormal physical examinations to support a disability finding on that basis.  Indeed, the only imaging results in the medical records show normal results.

Further inconsistencies exist in Plaintiff's claims to the agency and her representations to some physicians and their objective records.  For example, Plaintiff testified that she had mental impairments, despite the absence of medical records showing a history of mental health treatment. Plaintiff testified to the ALJ that she cannot work due to her fatigue and anxiety issues and that her alleged onset of disability was in December 2009.  In medical records, however, Plaintiff alleged the onset date was earlier, sometimes 2008 or 2006.  Despite allegations that she experienced symptoms in that time period, Plaintiff reported that her employment overlaps with this period, cutting against her allegation of total disability.  The VE testified that she worked until 2009.  This Court also notes that medical records from Dr. Sorensen show that Plaintiff denied experiencing body pain in the period 2009-2011, over multiple visits.  Despite Plaintiff's allegations that she is entirely disabled, the medical records reveal only inconsistent and conservative treatment of Plaintiff's condition, and for the conditions which serve as the basis of her disability claim – anxiety and back pain – largely no treatment.  In short, the record supports the ALJ's conclusion that Plaintiff lacked credibility as to the degree of her functional limitations.

Therefore, because of Plaintiff's lack of credibility, every medical opinion presented must be evaluated in light of its dependence on Plaintiff's self-serving representations.  The ALJ properly did

so, limiting his reliance on opinions based on Plaintiff's subjective representations of her physical condition.

B.  Expert Medical Opinions

The medical opinions of three types of medical sources are recognized in Social Security cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  Generally, a treating physician's opinion is entitled to more weight than the opinion of a doctor who examined but did not treat the claimant, and an examining physician's opinion is generally entitled to more weight than that of a nontreating physician. *Id.*, *see also* 20 C.F.R. § 404.1527; *Orn*, 495 F.3d at 631.  A treating physician is employed to cure and has a greater opportunity to know and observe the patient. *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987).  Nonetheless, a treating physician's opinion is not conclusive as to either a physical condition or the ultimate issue of disability. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

Physicians render two types of opinions in disability cases: (1) clinical medical opinions regarding the nature of the claimant's impairments and (2) opinions on the claimant's ability to perform work. *See Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).  "An ALJ is not bound by an expert medical opinion on the ultimate question of disability." *Tomasetti*, 533 F.3d at 1041; S.S.R. 96-5p.  The ALJ need not give weight to a conclusory opinion supported by minimal clinical findings. *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999); *Magallanes*, 881 F.2d at 751.  An ALJ must determine a claimant's RFC based on "all relevant evidence in the record." *Valentine v. Commissioner of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009).  The ALJ must set forth a detailed and thorough factual summary, address conflicting clinical evidence, interpret the evidence and make a finding. *Magallanes*, 881 F.2d at 751-55.

Where a treating or examining physician's opinion is uncontradicted by another doctor, the ALJ must provide "clear and convincing" reasons for rejecting the treating physician's ultimate conclusions. *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993). The ALJ must tie the objective factors of the record as a whole to the opinions and findings that she rejects. *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988). Questions of credibility and resolution of conflicts in the testimony are functions solely of the Secretary. *Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996), *cert. denied*, 519 U.S. 1113 (1997).

If the treating or examining doctor's medical opinion is contradicted by another doctor, the Commissioner must provide "specific and legitimate" reasons for rejecting that medical opinion, and those reasons must be supported by substantial evidence in the record. *Magallanes* at 830-31; *accord Valentine v. Comm'r Soc. Sec. Admin*., 574 F.3d 685, 692 (9th Cir. 2009). The ALJ can meet this burden by setting forth a detailed and thorough summary of the facts and conflicting clinical evidence, stating her interpretation thereof, and making findings. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).

Plaintiff contends that the ALJ erred by favoring the objective opinions of examining and non-examining physicians, who agree that Plaintiff is not disabled, over a treating physician's objective opinion and Plaintiff's subjective opinion that she is disabled. However, the ALJ analyzed the various expert opinions regarding Plaintiff's RFC, including those of the examining consultative physician, Dr. Michiel; and of the consultative non-examining physicians, Drs. De la Rosa, Bobba, Garland, and Patterson, as well as the treatment and other objective medical records. The ALJ explained in detail his preference for the opinion of these five doctors, whose consultative reports contemplated Plaintiff's various symptoms and diagnoses, the objective medical evidence, and her conservative treatment regime. The ALJ appropriately gave weight to these five physicians who – unlike Dr. Sorensen – agreed that Plaintiff was capable of work with some degree of functional limitations.

22

The ALJ gave very little weight to Dr. Sorensen's opinion, primarily because his reports were conclusive, based on Plaintiff's subjective self-serving reports, unsupported by minimal clinical findings, and were internally inconsistent.  The ALJ specifically noted that he gave Dr. Sorensen's opinion "very little weight because it is unsupported by the evidence, including the full range of motion in the extremities."  By that, the ALJ referred to Plaintiff's hospital records – also from a treating doctor – who opined that Plaintiff had a normal full range of motion.  The ALJ also emphasized that Dr. Sorensen's opinion in the medical source statement was inconsistent with the doctor's "normal physical examination findings" as shown in his own treatment records.  On that basis, the ALJ concluded that, despite Dr. Sorensen's status as Plaintiff's treating physician, his prepared forms were conclusory and his opinions lack support from clinical findings.  As such, the ALJ had discretion to discount those opinions. *See Meanel*, 172 F.3d at 1113; *Magallanes*, 881 F.2d at 751.  State agency medical examining and consultative physicians reviewed Plaintiff's medical records and all agreed that her impairments were not severe.  The ALJ gave substantial weight to the State agency consultants and Dr. Michiel's opinions because their conclusions were consistent with the longitudinal medical evidence.

Where treating doctors have contradictory opinions, the ALJ has discretion to weigh those opinions in the context of the overall medical record, and is merely required to show "clear and legitimate" reasons for discounting a conflicting opinion.  Here, the ALJ rejected Dr. Sorensen's opinion as to Plaintiff's disability on the legitimate basis that the doctor was not only contradicted by both the consultative and state agency physicians and by the treating physician at the hospital, but, significantly, by *his own* objective medical records.  As a result, the ALJ need only show "clear and convincing" justification for discounting Dr. Sorensen's opinion.   To justify discounting Dr. Sorensen's opinion, the ALJ called out the internal inconsistencies in Dr. Sorensen's opinions.  For example, the ALJ referred to exhibits 2F and 12F, where Dr. Sorensen's previous records contradict

his October 2010 medical source statement where he opines that Plaintiff is unable to maintain concentration and cannot withstand the stress associated with a normal workday.

Further, an ALJ may discount a check-the-box report that does not explain the basis of its conclusions. *See Batson v. Commissioner of the Social Security Administration,* 359 F.3d 1190, 1195 (9th Cir.2004) (ALJ properly rejected treating physician's conclusory check-list report); *Crane v. Shalala,* 76 F.3d 251, 253 (9th Cir.1996) (ALJ may reject check-off reports that did explain the basis of the conclusions).  The ALJ may also properly discount a treating physician's opinion that is not supported by treatment records. *See Bayliss v. Barnhart,* 427 F.3d 1211, 1216 (9th Cir.2005); *Thomas,* 278 F.3d at 957 (ALJ need not accept treating physician's opinion that is inadequately supported by clinical findings).  Dr. Sorensen's October 2010 reports are primarily checked boxes. He did write that his findings were based on "History," and that his recommended limitations were "based on perceived pain," but this is no real explanation.  Rather, on their face, these opinions are conclusory and dependent on Plaintiff's self-serving reports.  Dr. Sorensen's October 2010 reports are not supported by treatment records.

Dr. Sorensen's reports are also rife with contradiction.  For example, though not discussed by the ALJ, upon careful review of the record, this Court notes that his February 2012 psychiatric medical source statement, the doctor opined that Plaintiff was not capable of concentrating due to her "chronic gastrointestinal problems," but he fails to provide, and the Court cannot find, any clinical support for this proposition.  The ALJ highlighted that he further discounted Dr. Sorensen's opinion because he was seemingly unaware of the Plaintiff's alchohol use, another strike against his credibility.  This Court also notes that Dr. Sorensen seemed to believe that Plaintiff stopped work in 2006 and opined that Plaintiff's disability onset date was 2006, yet Plaintiff testified that she continued work until 2009.  In addition, the ALJ discussed that both the imaging from Advanced Medical Imaging and the treating doctor at the hospital directly contradict Dr. Sorensen's opinion as

24

to Plaintiff's pain complaints and the psychiatrist Dr. Michiel contradicted Dr. Sorense's opinions as to Plaintiff's mental health condition.

Substantial evidence weighs in support of the ALJ's findings and conclusion.  The opinions of nonexamining medical providers cannot by themselves serve as substantial evidence that justifies the rejection of the opinion of an examining or treating physician.  But, here, the weight of evidence from the spectrum of treating, examining, and consultative doctors lends overwhelming support for the ALJ's credibility determination.  As to Plaintiff's pain, Dr. Sorensen's own treating records show that Plaintiff only recently and sporadically complained of pain.  Moreover, Plaintiff's x-ray and CT scans from Advanced Medical Imaging had normal results.  Further, the treating physician at the hospital found that Plaintiff had a normal range of motion in her extremities.  And the consultative physicians observed Plaintiff's normal gait and posture.  At bottom, Plaintiff received merely conservative treatment, if any.  Then, as to Plaintiff's mental health issues, Dr. Sorensen listed his qualifications as a primary care physician, but he is not a psychiatrist.  Although treating physicians are accorded special weight (*see Lester* v. Chater, 81 F.3d 821, 833 (9th Cir. 1996)), an ALJ may reject a treating physician's opinion that is not supported by treatment records. *Bayliss,* 427 F.3d at 1216.  Here, there are no treating records showing that Dr. Sorensen provided mental health treatment.  In contrast, the examining psychiatrist Dr. Michiel performed a full psychiatric evaluation and concluded that Plaintiff did not have a severe mental impairment that would substantially affect her ability to work.  Moreover, Plaintiff conceded that she was not receiving psychiatric or mental health treatment or follow-up.  Finally, there are no medical records showing any mental health treatment or any periods of decompensation.

This Court concludes that substantial evidence supports the ALJ's decision to favor the opinions of the other doctors and the entirety of the objective medical records, and to discount Dr. Sorensen's conclusory and unsubstantiated opinions.  The ALJ gave specific and legitimate – and adequately clear and convincing – reasons for rejecting Dr. Sorensen's medical opinion.  The

reasons are supported by substantial evidence in the record and thus serve as cogent reasons for the ALJ's credibility determination.  The Court concludes that the ALJ did not err in his assessment of the relative credibility of Plaintiff and the various medical experts, nor in his decision to favor the opinion of the majority of the physicians over that of Plaintiff and one of her treating physicians. The Court will not disturb the ALJ's findings and conclusion.

**III.    Conclusion and Order**

The Court finds that the ALJ applied appropriate legal standards and that substantial evidence supported the ALJ's determination that Plaintiff was not disabled.  Accordingly, the Court **DENIES** Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of Court is **DIRECTED** to enter judgment in favor of the Commissioner and against Plaintiff.

IT IS SO ORDERED.

Dated:   __**November 17, 2014**__              _____**/s/ Sandra M. Snyder**
                                                         UNITED STATES MAGISTRATE JUDGE